# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————

EDWARD OMERT,

                Plaintiff,       Civil No. 16-2529 (NLH/AMD)

     v.

                        **OPINION**

FREUNDT & ASSOCIATES
INSURANCE SERVICES, INC.
trading as THE PRODUCERS
GROUP, C. KENT FREUNDT, and
VINCENT VITIELLO,

                Defendants.

———————————————

**APPEARANCES**:

BRUCE S. ROSEN
BIANCE M. OLIVADOTI
MCCUSKER, ANSELMI, ROSEN & CARVELLI, PC
210 PARK AVENUE, SUITE 301
PO BOX 240
FLORHAM PARK, NJ 07932

JEFFERY A. DONNER
STRYKER, TAMS & DILL LLP
TWO PENN PLAZA EAST
12TH FLOOR
NEWARK, NJ 07105

    *Attorneys for Plaintiff Edward Omert.*

GERALD J. DUGAN
MICHAEL J. LORUSSO
DUGAN, BRINKMANN, MAGINNIS & PACE, ESQS.
1880 JOHN F. KENNEDY BOULEVARD
STE. 1400
PHILADELPHIA, PA 19103

    *Attorneys for Defendants Freundt & Associates Insurance Services, Inc. and C. Kent Freundt.*

ALEXANDER G.P. GOLDENBERG
CUTI HECKER WANG LLP
305 BROADWAY
SUITE 607
NEW YORK, NY 10007

*Attorney for Defendant Vincent Vitiello.*

**HILLMAN**, District Judge

This case is a breach of contract and intentional interference with prospective economic advantage action brought under New Jersey common law. Presently before the Court are three motions for summary judgment: Plaintiff Edward Omert's Motion for Summary Judgment, Defendant C. Kent Freundt's Motion for Summary Judgment, and Defendant Vincent Vitiello's Motion for Summary Judgment. For the reasons expressed herein, this Court will deny Plaintiff's Motion for Summary Judgment and grant Defendant Freundt's and Defendant Vitiello's Motions for Summary Judgment.

**BACKGROUND**

The Court takes its facts from the statement of facts provided by the parties and will note any disputed facts where appropriate.

This case was brought by Plaintiff Edward Omert, a leader in annuity marketing. In August 2012, Plaintiff was contacted by Defendant Freundt & Associates Insurance Services, Inc. t/a The Producers Group ("TPG") concerning potential business opportunities. TPG is an Independent Marketing Organization

("IMO") based in California which focuses primarily on life insurance product sales. Defendant C. Kent Freundt is the President and majority owner of TPG. Defendant Vincent Vitiello was the Executive Vice President of TPG's East Coast Division at the time.[1] Vitiello was the individual who reached out to Omert concerning an idea to have Omert help TPG grow its annuity business.

Shortly after receiving this initial contact, Omert met with Vitiello and Freundt to start discussions. Omert, after further communications, sent a spreadsheet in October 2012 to both Freundt and Vitiello proposing a rough financial structure for TPG's so-called Annuity and Linked Benefits Division (the "Annuities Division"). This was revised, and after a trip to San Diego several months later, was converted into a document entitled "Term Sheet/Agreement/Structure" (the "Term Sheet"). This Term Sheet, the circumstances of its creation and dissemination, and the discussions between the parties about it – both before and after it was signed – comprises the factual lynchpin of this case.

The Term Sheet, which was initially sent to TPG in February 2013, generally states the following:

- Plaintiff would head the Annuities Division,

---

[1] Collectively, Freundt and Vitiello will be referred to by this Court as the "Individual Defendants."

- Plaintiff's title would be Senior VP of Annuities and Linked Benefit Products,

- Plaintiff would be both a co-owner of the Annuities Division and an employee of TPG,

- Plaintiff would work out of his New Jersey home, but would also be given an office in San Diego,

- Plaintiff would be responsible for his own expenses,

- Plaintiff would receive no salary, but would be entitled to a revenue split based on the amount of sales made as compared to a baseline, and

- Plaintiff would co-own any sales methodologies or systems Plaintiff developed while working for TPG.

In addition to the Term Sheet and at the same time, Omert sent an analysis, specific recommendations, and a chronology for building the Annuities Division.

Freundt signed the Term Sheet on May 22, 2013. Once Omert received it, he stated he signed it and sent it back via regular mail to Freundt. (Pl.'s Br. 5.) However, the parties disagree as to whether the Term Sheet was ever signed and sent by Omert. Defendant TPG argues they never received the Term Sheet and Omert admits he never informed TPG that he had signed the Term Sheet and was sending it back to them. Defendant TPG asserts Omert has never produced a signed copy during the litigation.

Unless TPG is challenging the authenticity, it appears Plaintiff has produced a signed agreement. (Rosen Certification Ex. 23.) Thus, if any dispute of fact exists, it appears to be a dispute over whether TPG received a copy (at the time) of the Term Sheet signed by Omert.

After allegedly signing the agreement, Omert exchanged several emails with Freundt, Vitiello, and other TPG employees. The details of these emails will be discussed as relevant, infra. For the sake of context, this Court notes the emails generally discussed financial reports requested by Omert, questions on the Term Sheet sent by Freundt, and scheduling various meetings and calls.

Eventually, Freundt emailed Omert letting him know he would like to put everything on hold for a few months. Omert responded. This email is discussed at length, infra. Omert turned his attention to Vitiello, who exchanged emails and calls with him concerning the Term Sheet and arrangements for the Annuities Division. Eventually, the parties ended discussions and did not communicate between August and December 2013. On December 16, 2013, Vitiello emailed Omert to let him know TPG would be outsourcing its annuities program to Dressander/BHC ("Dressander"). In July 2013, TPG, Vitiello, and Freundt started negotiations with Dressander to outsource its annuities sales. Omert responded the next day, stating his belief that an

agreement had been reached to pursue the Annuities Division proposed by Omert.

Plaintiff Omert filed a complaint in this Court on May 5, 2016 against Defendants TPG, Freundt, and Vitiello. The complaint includes four counts: breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment against TPG and intentional interference with prospective economic advantage against Freundt and Vitiello. Defendant Vitiello moved to dismiss the sole claim asserted against him on June 30, 2016.[2] This Court denied that motion via Opinion and Order on January 31, 2017. Discovery ensued and the instant motions for summary judgment were filed on May 25, 2018. The motions are fully briefed and ripe for adjudication.

## ANALYSIS

### A. Subject Matter Jurisdiction

This Court possesses subject matter jurisdiction over the present action pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties and the amount in controversy exceeds $75,000.

### B. Motion for Summary Judgment Standard

Summary judgment is appropriate where the Court is

---

[2] As discussed _infra_, the motion to dismiss was brought, in part, on grounds again asserted by Vitiello in his Motion for Summary Judgment: he cannot legally be held responsible for actions he took within the scope of his employment.

satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." (citing Celotex, 477 U.S. at 325)).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and

affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 257.

## C.  Plaintiff's Motion for Summary Judgment

Plaintiff presents two main reasons why this Court should grant his request for summary judgment.  First, Plaintiff argues there is no factual dispute as to the existence and terms of the alleged contract between the parties, meaning solely questions of law are left for the Court to decide as to the breach of contract claim.  Second, Plaintiff argues there is no factual dispute as to Defendant TPG's actions concerning the contract, which – as a matter of law – constitutes bad faith conduct.  Defendant TPG resists this motion on multiple grounds.  TPG's main argument focuses on whether the Term Sheet was a tentative agreement or agreement to agree or whether it was an enforceable contract.  This Court will address each claim in turn.

### a. <u>Breach of Contract</u>

A breach of contract action requires a plaintiff to prove "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." <u>Frederico v. Home Depot</u>, 507 F.3d 188, 203 (3d Cir. 2007) (citing <u>Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.</u>, 210 F. Supp. 2d 552, 561 (D.N.J. 2002)).  To succeed on summary judgment, Plaintiff must show his entitlement to judgment on

each element.

First, Plaintiff must show a valid contract existed between Plaintiff and Defendant TPG.  The Court notes here that both parties agree the alleged agreement – whether or not enforceable – was meant to be an employment agreement for Omert to work at TPG.  Plaintiff asserts the Term Sheet is a valid contract between the two.  Although rather informal in nature, Plaintiff argues it contains the essential terms needed to bind Plaintiff and TPG.  Defendant TPG asserts there was no valid contract, just an "agreement to agree" because it was merely preliminary. (Def. TPG's Opp. Br. 5.)  In essence, it appears Defendant TPG argues this was a tentative agreement and negotiations were ongoing.  This Court must determine whether a contract existed before it can determine whether judgment is appropriate in this case.

Generally, "[a] contract is formed where the essential terms of an agreement have been communicated between the parties and there has been mutual assent to those terms."  Air Master Sales Co. v. Northbridge Park Co-Op, Inc., 748 F. Sup. 1110, 1114 (D.N.J. 1990) (citing Knight v. New England Mut. Life Ins. Co., 533 A.2d 55, 58 (N.J. Super. Ct. App. Div. 1987)).

Contracts may exist in all manner of forms.  As Plaintiff points out, "[i]t is well settled that parties may effectively bind themselves by an informal memorandum where they agree upon

the essential terms of the contract and intend to be bound by the memorandum, even though they contemplate the execution of a more formal document." Berg Agency v. Sleepworld-Willingboro, Inc., 346 A.2d 419, 422 (N.J. Super. Ct. App. Div. 1975). The Court agrees, and does not find that the general form of the Term Sheet in any way precludes a finding that it is a binding contract.

Still, the "ultimate question is one of intent." Comerata v. Chaumont, Inc., 145 A.2d 471, 475 (N.J. Super. Ct. 1958). Thus, it is only "[i]f the negotiations are finished and the contract between the parties is complete in all its terms and the parties intend that it shall be binding, then it is enforceable . . . [even though] the parties contemplate that a formal agreement shall be drawn and signed." Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F. Supp. 342, 349 (D.N.J. 1996) (quoting Moran v. Fifteenth Ward Bldg. & Loan Ass'n., 25 A.2d 426, 430 (N.J. Ch. 1942)) (emphasis added).

In other words, "[w]hen parties enter into negotiations and reach a tentative agreement, but do not intend to be bound until a formal contract be executed, they cannot be held to their tentative bargain." Moran, 25 A.2d at 429-30. See also De Vries v. Evening Journal Ass'n, 87 A.2d 317, 318 (N.J. 1952) ("So long as negotiations are pending over matters relating to the contract, and which the parties regard as material to it,

and until they are settled and their minds meet upon them, it is not a contract, although as to some matters they may be agreed . . . ." (citation and internal quotation marks omitted)).  As the New Jersey Supreme Court stated in De Vries, "whether or not a valid binding contract was entered into between the parties" is "essentially a factual one."  87 A.2d at 317.

There appears to be disputed facts here as to whether Defendant TPG (or Plaintiff Omert) intended to be bound only when a formal agreement was drafted or whether it intended to be bound at the time of the signing of the Term Sheet.  This is a question of fact that is inappropriate for this Court to decide on a motion for summary judgment.  Thus, this Court will deny Plaintiff's Motion for Summary Judgment on the breach of contract claim.  Although this Court does not decide the final import of the facts discussed infra – as that is a task reserved for the jury – the Court will discuss the disputed facts which led to its decision to deny summary judgment on this claim.

In favor of the parties not intending the Term Sheet to be a binding employment agreement are the following facts.  First, it appears Plaintiff himself described the Term Sheet as "a template for a written agreement."  (Def. TPG's Opp. Br. 6.)  Of significance, this note appeared in documents sent with the Term Sheet.  Thus, a reasonable jury could find the parties only agreed as to a template for a contract, but not the actual

terms.  This could be interpreted as a tentative agreement subject to further negotiation.  Second, Freundt states he believed at the time that the term sheet was not a binding employment agreement.  (Def. TPG's Opp. Br. 6.)  A reasonable jury could find here that there was not a meeting of the minds – even if it is assumed Omert intended this to be a binding employment agreement.  Third, one week after the Term Sheet was signed, Omert sent an email to Freundt with additional questions about the Term Sheet, and Omert seemed to indicate the Term Sheet was not yet a final agreement.  (Def. TPG's Opp. Br. 6.)

Fourth is an email sent by Omert on June 19, 2013.  This was about a month after the Term Sheet was allegedly signed by Freundt, on behalf of TPG, and Omert.  In it, Freundt tells Plaintiff he cannot find the time for this venture and would like to revisit the idea in a few months.  It appears that Freundt believed negotiations were ongoing and had not yet signed a binding agreement.

In response, Plaintiff makes a few statements which appear to reveal his intent in signing the Term Sheet.  Plaintiff stated "I don't need a job, [TPG is] not offering me one."  If Plaintiff intended the term sheet to be his employment agreement, albeit informally drafted, a reasonable juror might ask why he would say TPG was not offering him a job.  It is more likely that Plaintiff would have stated he was employed with TPG

or at least not disavow his employment.  Plaintiff also stated
that only "most of the structure" was agreed upon.  Thus, it
appears Plaintiff has admitted here there were still open
questions which required further negotiation.  Furthermore,
Plaintiff requests Freundt to "address the issues and move
forward one way or the other."  Again, this seems to show that
Plaintiff's intention with the Term Sheet was not the creation
of a binding agreement, as a reasonable juror may interpret this
statement as Plaintiff admitting Defendant TPG could either sign
a binding agreement or abandon it after further negotiations.

    Obviously, this is only one interpretation.  A number of
facts also support the theory that this was a binding employment
agreement.  First, is the email in which Omert sends Freundt the
Term Sheet.  In the covering email, Omert states the Term Sheet
encapsulates the "main aspects of our agreement" and that a
"more detailed contract can come later."  (Pl.'s Reply Br. 3-4.)
Second, after the Term Sheet was signed, Plaintiff sent an email
to Freundt saying the Term Sheet included "all of the 'big
issues' so they could 'get going.'"  (Pl.'s Reply Br. 4.)
Third, in the same email, Plaintiff stated the Term Sheet would
"form the basis for [the] formal agreement."  (Pl.'s Reply Br. 4
(alteration in original).)  Fourth, and most importantly, is the
signed Term Sheet itself.  Along with conversations and actions
taken by the parties before and after the Term Sheet is signed,

these facts could serve as circumstantial evidence of the intent of the parties to enter into a binding employment agreement.

Plaintiff's citation to Hackensack Univ. Med. Ctr. v. Yinglian Xiao is distinguishable. No. 2:17-cv-2822 (KM/MAH), 2018 U.S. Dist. LEXIS 76534 (D.N.J. May 7, 2018). That case involved a "Term Sheet" – really a settlement agreement - signed by counsel for the two parties to the litigation. Id. at *4-8. The "Term Sheet" contained fifteen numbered paragraphs describing in detail the promises made by each party. Id.

In discussing whether there was a meeting of the minds, id. at *17-19, the court finds that "unexpressed, subjective intent is not relevant to [a] contract's validity." It appears in that case, there was no evidence presented at the time of the execution of the agreement that would indicate the parties viewed it as anything other than a binding agreement. Id. at *18-19 ("Undisputed facts show a signed agreement, not mere preliminary negotiations."). It appears the first time plaintiff complained it was not binding was when litigation was commenced. Id. This is not the case here. None of the record facts presented show conclusively that the Term Sheet was intended to be a binding employment agreement. Instead of factual clarity, the outwardly-manifested intentions of the

parties create a factual muddle.[3]  Accordingly, this Court will

deny Plaintiff's request to find in his favor on the breach of

contract claim because a factual question still exists on

whether an enforceable employment agreement existed.

> b. Good Faith and Fair Dealing Claim

Plaintiff also requests this Court to enter judgment in his

favor, on liability only, for his breach of the implied duty of

good faith and fair dealing claim.  Generally, "[e]very party to

a contract . . . is bound by a duty of good faith and fair

dealing in both the performance and enforcement of the

contract."  Brunswick Hills Racquet Club, Inc. v. Route 18

Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005) (citing

Wilson v. Amerada Hess Corp., 773 A.2d 1121 (N.J. 2001); Sons of

Thunder, Inc. v. Borden, Inc., 690 A.2d 575 (N.J. 1997)).

Because this Court cannot find, as a matter of law, that there

is a binding contract, it cannot grant Plaintiff summary

judgment on his good faith and fair dealing claim.  See Wade v.

Kessler Inst., 778 A.2d 580, 584 (N.J. Super. Ct. App. Div.

2001) ("[I]n the absence of a contract, there can be no breach

of an implied covenant of good faith and fair dealing." (quoting

Noye v. Hoffmann-La Roche, Inc., 570 A.2d 12, 14 (N.J. Super.

---

[3] Plaintiff's other arguments on its breach of contract claim are
rendered moot by the decision of this Court that it cannot
decide there was a binding employment agreement.

Ct. App. Div. 1990))).  Accordingly, this Court will deny

Plaintiff's Motion for Summary Judgment on this claim as well.[4]

### D.    Defendant Freundt and Vitiello's Motions for Summary Judgment

Defendants Freundt and Vitiello also move for summary

judgment on the only claim asserted against them, intentional

interference with prospective economic advantage.  A claim for

intentional interference is subject to a four-element test: "(1)

a reasonable expectation of economic advantage to plaintiff; (2)

interference done intentionally and with malice; (3) causal

connection between the interference and the loss of prospective

gain; and (4) actual damages."  Crane v. Yurick, 287 F. Supp. 2d

553, 562 (citing Printing Mart-Morristown v. Sharp Electronics

Corp., 563 A.2d 31 (N.J. 1989)).

Individual Defendants do not challenge the sufficiency of

either the first or fourth element.  Instead, Individual

Defendants focus on: (a) for Defendant Vitiello only, whether a

sufficient causal connection has been shown, (b) whether they

are the proper subject of suit because their actions were taken

completely within the scope of their employment, and (c) whether

their actions qualify as malicious.[5]

---

[4] Because this Court cannot find, as a matter of law, that an
enforceable contract existed, Plaintiff's argument on the merits
of the good faith and fair dealing claim are also rendered moot.

[5] This Court will not consider Individual Defendants third

Before considering Individual Defendants' motions, it is helpful to consider what Plaintiff alleges occurred. Essentially, Plaintiff alleges Individual Defendants were – at one point – interested in pursuing an opportunity with him. But, at some point during the negotiation process that interest changed because Defendant Freundt realized the arrangement would be an impediment to the sale of his company and Defendant Vitiello realized he could make more money if he headed the Annuities Division. After realizing the possibility for greater individual profit, the Individual Defendants worked to undermine Plaintiff's proposal even though it would have been more beneficial to TPG. Individual Defendants dispute these facts strenuously, arguing they were both only interested in working on behalf of TPG and for TPG's benefit, not for their own personal gain.

a. Causation

First, this Court will address whether there remains an absence of sufficient facts or disputed facts as to the element of causation for Defendant Vitiello. "A plaintiff shows causation when there is 'proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic

---

argument, as it is rendered moot by this Court's decision on the first two arguments.

benefits.'" <u>Printing Mart-Morristown</u>, 563 A.2d at 41 (quoting <u>Leslie Blau Co. v. Alfieri</u>, 384 A.2d 859, 865 (N.J. Super. Ct. App. Div. 1978)). Defendant Vitiello argues Plaintiff has not shown the required causation element because it was Defendant Freundt, not he, who was solely responsible for the decision at issue. Plaintiff counters that Defendant Freundt's reason for denying Omert the Annuities Division was suspect and that Individual Defendants "acted in tandem to achieve . . . their own selfish purposes . . . to the detriment of TPG." (Pl.'s Opp. Br. 25-26.)

This Court finds, in light of the undisputed factual basis presented by Defendant Vitiello, Plaintiff has not pointed to any disputed facts that would allow him to survive Defendant Vitiello's Motion for Summary Judgment. Defendant Vitiello asserts that (1) "[o]nly Mr. Freundt had the authority to commit TPG to new ventures" and (2) "Mr Freundt ran TPG and would need to approve of Plaintiff joining the company." (Freundt & Vitiello's SOMF ¶¶ 19, 39.) Plaintiff does not dispute these facts. (Pl.'s SOMF ¶¶ 19, 39.) These facts show, that regardless of any action taken by Defendant Vitiello, Defendant Freundt would have still refused to employ Plaintiff at TPG. Plaintiff has not brought forth facts showing – even if this Court assumes for the sake of argument the truth of his assertions - a reasonable probability that the outcome was

caused by Vitiello's alleged interference.

If Defendant Vitiello was never part of the factual scenario here – and otherwise assuming the Plaintiff's assertions – the outcome would be the same. Plaintiff theorizes that both Individual Defendants had personal reasons – separate and distinct – for deciding against working with him. Specifically, Plaintiff theorizes or admits that (1) Defendant Freundt had his own reason for not allowing TPG and Omert to work together and (2) Defendant Freundt had sole decision-making authority over whether the deal would go forward. Based on that, even without Vitiello, Freundt would have still refused to do business with Omert. Any action taken by Defendant Vitiello notwithstanding, the outcome would be exactly the same.[6]

Plaintiff's arguments in his opposition brief are inapposite. Whether Defendant Freundt sincerely held the belief that TPG should not bring in new ventures does not change the decision here. If he truly believed it, he would not have allowed TPG and Omert to start an Annuities Division. If he did not truly believe it and instead wished to pursue solely

---

[6] Plaintiff does not appear to contest that the issue raised by Defendant Vitiello concerning whether the percentage of commissions offered had any effect whatsoever on Defendant Freundt's decision here. Therefore, whether Defendant Vitiello shared that Freundt's concern with Plaintiff does not affect the Court's decision.

personal gain through the sale of a company unencumbered by another co-owner, again, the outcome would be the same. Vitiello's actions are irrelevant to that consideration. Moreover, the theory that Vitiello and Freundt acted in tandem to deny Omert this business opportunity does not satisfy the causation requirement here. No party has brought forward any case law that would support this theory of causation. More fundamentally, Plaintiff does not base this assertion in facts on the record. Accordingly, this Court will grant Defendant Vitiello's Motion for Summary Judgment.[7]

> b. <u>Scope of Employment</u>

Defendant Freundt argues summary judgment is appropriate on this claim as to him because the undisputed facts show he was working solely within the scope of his employment with Defendant TPG. If this is correct, Freundt argues, the intentional interference with prospective economic advantage claim is legally insufficient and should be dismissed. Plaintiff counters by arguing Freundt did not act within the scope of his employment, but instead acted for his own personal gain.

In <u>Varallo v. Hammond Inc.</u>, the Third Circuit opined on the New Jersey test to determine whether an agent may be held liable

---

[7] Because the Court finds the causation element has not been met here, the other arguments made by Plaintiff and Defendant Vitiello on Vitiello's liability for this claim are rendered moot and will not be considered by the Court.

for intentional interference with actions taken by his company with another individual or entity.  94 F.3d 842, 849 n.11 (3d Cir. 1996).  Basing its decision on agency law concepts, the Third Circuit stated only "an employee who acts for personal motives, out of malice, beyond his authority, or otherwise not 'in good faith in the corporate interest'" can be held liable for tortious interference.  Id.  In other words, intentional interference claims are barred in New Jersey unless a plaintiff can show "the employee acted outside the scope of his employment."  Silvestre v. Bell Atl. Corp., 973 F. Supp. 475, 486 (D.N.J. 1997), aff'd, 156 F.3d 1225 (3d Cir. 1998).

The basis for this test was explained by the New Jersey Supreme Court when it interpreted agency law for an intentional interference claim.  In Printing Mart-Morristown, the New Jersey Supreme Court relied heavily on the Restatement (Second) of Agency § 343 (Am. Law Inst. 1958).  That section states:

> An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interests, or where the principal owes no duty or less than the normal duty of care to the person harmed.

Thus, when an employee acts within the scope of his duties he steps into the shoes of the principal and is subject to the same privileges under law as the principal.  Printing Mart-

<u>Morristown</u>, 563 A.2d at 42-43.  Since a contracting principal is a party to a contract, it cannot be held to intentionally interfere – and neither can its employees, as long as they are acting within the scope of their employment.  <u>Id.</u>

Plaintiff asserts the scope of employment question is a factual one.  <u>See</u> <u>Costello v. City of Brigantine</u>, No. 99-4072 (JBS), 2001 U.S. Dist. LEXIS 8687, at *23 (D.N.J. June 28, 2001) ("[T]he question of whether [defendant] was acting with malice and thus outside the scope of his job when he fired [plaintiff] is fundamentally one of fact." (citing <u>Marley v. Palmyra Bor.</u>, 473 A.2d 554 (N.J. Super. Ct. Law Div. 1983))).  But, Defendant Freundt cites numerous cases where courts in this district have dismissed intentional interference claims on these grounds on either motions to dismiss or motions for summary judgment. (Def. Freundt's Br. 11, n.5.)  Ultimately, the Court is guided and constrained by the summary judgment standard on questions of fact.

Before discussing the law, it is important to understand the undisputed facts.  Both Plaintiff and Defendant Freundt acknowledge that Freundt was the majority shareholder, President, and Chief Executive Officer of Defendant TPG. Plaintiff understood at the time, and does not dispute now, that it was Freundt who possessed the sole decision-making authority as to his employment and the creation of the Annuities Division.

23

With those undisputed facts in mind, Freundt argues this case is analogous to <u>Sammon v. Watchung Hills Bank for Sav.</u>, 611 A.2d 674 (Super. Ct. Law Div. 1992). In that case, a plaintiff brought an intentional interference case against a defendant who was the president and sole stockholder of the company with which she was attempting to enter a contract. <u>Id.</u> at 676. The court dismissed it. <u>Id.</u> at 677.

In doing so, the court presented a number of legal reasons. First, the court distinguished between an employee and a principal. The court found an employee should be treated differently than an owner or principal under the law. Second, the court believed only the defendant "could exercise the privilege of the principal referred to in the second principle of agency" cited in the <u>Printing Mart-Morristown</u> case. In other words, the individual is the same in the eyes of the law for an intentional interference claim as the principal, there a corporation. Third, and relatedly, the court thought it would be contradictory to exempt the corporation from suit while allowing the same claim against the sole shareholder to move forward. One basis was in agency law while another seemed to lie in practicalities – there was no practical difference between the sole shareholder and the corporation.

As a matter of law, based on the undisputed facts, this Court finds that Freundt should be treated in the same way as

TPG.  The relevant facts here are undisputed.  Thus, the Court is presented with solely a legal question that need not be presented to the jury.  That question is whether the majority shareholder is sufficiently analogous to the sole shareholder. This Court holds, based on New Jersey law, the answer is yes.

The answer is compelled by the practical implications of Sammon.  Freundt, like the defendant in Sammon, was not merely a supervisor or employee; he was an owner and officer.  Although there were other shareholders, Freundt had majority control. Freundt was thus the only individual who could exercise the privilege of the principal, TPG, just like the defendant in Sammon.  While there can be many owners of a corporation, if there is a majority owner, there can only be one.  Plaintiff is wrong to label Freundt as merely a "primary" shareholder, he is the majority shareholder of TPG and thus its majority owner.

The Court understands Plaintiff's arguments, but finds they are ultimately unpersuasive.  While Plaintiff is correct that Freundt could make a decision for TPG that inures more to his benefit than the other shareholders, that is not the operative test in New Jersey.

Plaintiff's arguments neglect to address the New Jersey test.  As described above, the test is whether the individual stands in the shoes of the principal.  Here, by the very fact of his ownership stake in TPG, Freundt stands in the shoes of the

principal, TPG.  Freundt is not merely an employee, he is the majority owner.  Practically, Plaintiff's arguments suffer as well.  It essentially allows Plaintiff to bring a duplicative claim.  If Plaintiff's argument were accepted, and judgment was entered in favor of Plaintiff on all counts, Freundt would be forced to pay for breach of contract as an owner of TPG and again for tortious interference – for essentially the same conduct.  That outcome cannot be correct.

If TPG cannot be sued for intentional interference because it is a party to the alleged contract or negotiations, then Freundt should be afforded the same protections.  It would be abhorrent to agency law, the directives of the New Jersey Supreme Court, and commonsense to decide otherwise. Accordingly, this Court will grant Defendant Freundt's Motion for Summary Judgment on the intentional interference claim.[8]

---

[8] Because the Court finds Defendant Freundt was acting as the principal, TPG, the other arguments made by Plaintiff and Defendant Freundt on Freundt's liability for this claim are rendered moot and will not be considered by the Court.

## **CONCLUSION**

Based on the foregoing reasons, this Court will deny

Plaintiff's Motion for Summary Judgment and grant Defendant

Freundt's and Defendant Vitiello's Motion for Summary Judgment.

An appropriate Order will be entered.


Date: ___December 20, 2018___          ___s/ Noel L. Hillman___
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.